## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| **RICHARD LANE HOPKINS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 10-cv-2025 (RMC)** |
| ) | |
| **GRANT THORNTON INTERNATIONAL** ) | |
| **and GRANT THORNTON LLP,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| _____ ) | |

### MEMORANDUM OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Richard Lane Hopkins claims that Grant Thornton LLP interfered with his rights to leave without pay for a serious medical condition and also retaliated against him for asking for such leave by firing him. Mr. Hopkins misperceives his legal rights and the standards that pertain to his claims. Finding that his claims have no merit, the Court will grant summary judgment to Grant Thornton.

### I. FACTS

Mr. Hopkins started working for Grant Thornton LLP[1] in September 2007 as a

_____

[1] Mr. Hopkins initially sued Grant Thornton International, which is the parent company of Grant Thonton LLP. Amended Compl., [Dkt. # 12] ¶ 6. Although he amended his Complaint to add Grant Thornton LLP, his direct employer, he refused to dismiss Grant Thornton International without discovery, fearing that the two entities may constitute a single employer and that Grant Thornton LLP may lack the resources to satisfy his claims. The Court stayed all such discovery pending a decision on the merits against the more immediate employing defendant. Given the Court's disposition of the motion for summary judgment filed by Grant Thornton LLP, the Court will also dismiss Grant Thornton International from this suit.

Senior Consultant with the Global Public Sector ("GPS") division based in Alexandria, Virginia. From September 2007 to April 2008, he worked on a contract with the Department of Homeland Security for its Security Immigration and Customs Enforcement Student Exchange Visitor Program in the District of Columbia.  However, Mr. Thornton was unable to obtain necessary clearances, and he was removed from that project.  He found a new opportunity on the Iraq Business and Stability Operations Program ("Iraq Stability Program") under contract with the Department of Defense ("DoD").  The Iraq Stability Program was designed to improve business and stability operations in Iraq; a majority of the employees in the GPS division worked on the Program, providing consulting and procurement advisory services.  Mr. Thornton worked in Baghdad and Erbil, Iraq on this Program.

 Funding issues led to a reduced DoD contract in the summer of 2009.  Mr. Hopkins' position in Baghdad ended in August 2009, and he returned to this country.  As a Senior Consultant, Mr. Hopkins was obligated to find alternative work within Grant Thornton to maintain sufficient client-billable hours.[2]  He looked for work in the Iraq Stability Program and GPS Director Terry Garman placed him with the Iraq Investment Conference for approximately six weeks between September and October of 2009, during which time he worked in the District.

 The cuts in August were followed by a "stop work" order on December 19, 2009,

---

[2] GPS employees who work directly on client projects are expected to work approximately 1,790 hours a year on client projects, approximately 150 hours a month.  Those employees who are not engaged full time on a client specific project are "on the bench" and have responsibility, with help from GPS's Resource Management Department, company mentors and coaches, and others, to find more work to do.  When work is lacking, GPS's Human Resources ("HR") Department provides consultants with formal notice that they must find chargeable work or face termination.  These notices may be rescinded if the employee is able to find chargeable work in the meantime.

due to a lack of funding.  Ms. Garman ordered all employees associated with the Iraq Stability

Program to stop performing work immediately.  On December 31, 2009, DoD directed GPS to

reduce the cost of the contract by 20%, requiring adjustments and some down-sizing.  The Iraq

Stability Program contract was ultimately terminated in March 2010.  Grant Thornton attributes

Mr. Hopkins' discharge to the necessary reductions in force and eventual dissolution of the

International Division of GPS.

Mr. Hopkins' billable hours tracked the decline of the Iraq Stability Project.  His

hours in August (171), September (191), and October 2009 (184) were very high.  In November

2009, he had only 79.5 billable hours, and in December 2009, he had only 83. In December, he

was actively "looking for billable work" because he "knew he could not sit around and not do

anything."  *Id*. at ¶ 114.

Mr. Hopkins worked 80 billable hours on a temporary assignment for the Iraq

Stability Program in January 2010.  Ms. Garman cautioned him that there would be no further

work on the Program and he must work with HR to find another position.  On January 20, 2010,

HR informed Mr. Hopkins that he needed to find billable work by February 12, 2010, or he

would be terminated.  Mr. Hopkins advised a friend that the news was "amusing" but "very

stressful."  Def.'s SOF ¶ 52.  However, a week later, his Grant Thornton "coach" suggested an

assignment at the Washington Headquarters Service Project ("WHS Project") in Arlington,

Virginia.  Mr. Hopkins interviewed for the position and began work almost immediately on

February 3, 2010.

At the same time, Mr. Hopkins experienced problems with a personal relationship

that caused him to experience a high level of stress.  He attributes difficulty that he experienced

on the WHS Project to this stress; his new managers noted that he failed to appear for work at the client site without notice and exhibited rude and distracted performance when he was there. Although he was counseled about these performance problems, Mr. Hopkins was unable to improve quickly, so on February 23, the WHS Project leaders, Robert Misch and John Adams, removed him from the Project.

After this, Mr. Hopkins sought assistance from the head Partner for the GPS International Division, Rhoda Canter.  He told Ms. Canter that he had failed to appear at the client site, communicated badly with WHS Project leadership, and caused questions from the client but that his behavior was due to the difficulties ensuing from the break-up of a personal relationship.  Now that his partner had returned, he assured her that his inappropriate behavior "would never happen again."  Def.'s SOF ¶ 82.  Ms. Canter advised that his poor performance on the WHS Project would make it more difficult for Mr. Hopkins to find new work at Grant Thornton and that it posed a serious issue in light of the number of persons losing positions with the Iraq Stability Program, who were also looking for new work.  Mr. Hopkins immediately began reaching out to friends and colleagues in an effort to find billable work.

However, things went from bad to worse.  On March 10, 2010, GPS learned that DoD had terminated the contract for the Iraq Stability Program and would no longer need Grant Thornton's services after March 29, 2010.  Scott King, a GPS Partner, communicated this news to the entire Iraq Stability Team at 8:28 p.m. on March 10, and told them that Ms. Garman would be meeting with HR in the morning and then contacting each employee "with instructions" about their future at the company.  Def.'s SOF ¶ 124.

On the afternoon of March 11, Morgan Kinghorn, Chief Operating Officer of

Grant Thornton, instructed Cathy Carney-Peters, head of Human Resources, regarding employees affected by the termination of the program:

> For those employees hired specifically for this engagement: default, remove.  For other employees, based on performance, etc., if no issues, give them 30 days to get fully billable; if not remove . . . .  We simply cannot afford to keep folks in [I]nternational unless there is a significant reason; and no one that does not have billable work.

SOF ¶¶ 126-127.   Also on March 11, 2010, during a lengthy transition meeting dealing with the end of the Iraq Stability Program, Ms. Carney-Peters and GPS leadership discussed plans for downsizing the International Division and, specifically, those twenty-odd GPS employees who would be affected.  At the end of the meeting, Mr. Hopkins was preliminarily slated for termination as of March 16, 2010.[3]  The parties dispute whether Mr. Hopkins had been "on the bench" for a continuous amounts of time between the end of 2009 and beginning of 2010, but can agree that Mr. Hopkins was on and off projects at this time.  It is undisputed that Mr. Hopkins did not work over 90 chargeable hours in any month between November 2009 and March 2010.  In addition, Mr. Hopkins was "on the bench" as of February 23, 2010 and could not find placement on a chargeable project.  No work materialized for Mr. Hopkins after this date, and Ms. Canter gave final authorization to terminate Mr. Hopkins on March 15.

        The entire GPS International Division was dissolved as a result of the termination of the Iraq Stability Program.  Grant Thornton made the business decision to withdraw from similar international work.  Approximately 50 employees were terminated during the spring and

---

[3] Mr. Hopkins disputes this fact, stating that he "was clearly terminated without any notice because he requested [FMLA] leave." Pl's Resp. to Def.'s Local Rule 7(H) Statement of Material Facts [Dkt. # 36] ¶ 131.  However, he does not dispute that he was slated for termination at this time.

Ms. Canter, the head Partner in the Division, was involuntarily terminated from Grant Thornton in July.

After the announcement that the Iraq Stability Program was officially cancelled, Mr. Hopkins contacted Karen L. Campbell, an HR Manager, early in the morning on March 11 and asked to meet with her.  Mr. Hopkins discussed his poor performance on the WHS Project with Ms. Campbell.[4]  He also commented that "the issues . . . were transpiring in [his] life," including the loss of a colleague and problems in a personal relationship.  Def.'s SOF ¶ 189.  Ms. Campbell noted that Grant Thornton offered various benefits that might help Mr. Hopkins, such as paid time off, short-term disability, and leave under the Family and Medical Leave Act ("FMLA").  The exact nature of this discussion is contested – Mr. Hopkins says that he "requested" FMLA leave at the time and Ms. Campbell says that FMLA leave was only one potential benefit that was mentioned – but the parties agree that Ms. Campbell thereafter sent an email to Mr. Hopkins with an FMLA informational packet and application form.  Pl.'s SOF ¶¶ 4-5; Def.'s SOF ¶¶ 196-198.  There is no dispute concerning GPS's normal policy by which HR avoids specific discussion of FMLA leave until an employee submits an application and medical certification, which allows evaluation of whether the employee qualifies for such leave.  Mr.

_____

[4]  Ms. Campbell reported to Ms. Canter that she met with Mr. Hopkins on March 11, 2010, and that he was concerned that a Grant Thornton manager, considering him for work on a new project, had asked him about his "poor rating" on the WHS project.  Pl.'s Opp.'n To Def.'s Mot. for Summ. J. Ex. 2 [Dkt. # 36-1] at 2.  Ms. Campbell noted that Ms. Canter was "not opposed to Rich working on this new engagement . . . and we would also support it."  *Id.*  Later on March 11, however, Ms. Campbell reported to Ms. Canter that the manager on the potential new project for Mr. Hopkins "has now changed her mind about Rich because he would be the only GT staff 'on the ground,' [dealing on-site with the client] on this engagement and [she] feels nervous about that."  *Id.* at 1.  In response, at 4:54 pm on March 11, Ms. Canter directed, "I am afraid we need to give him notice of termination."  *Id.*  At this time, Ms. Canter did not know that Mr. Hopkins had been provided an FMLA application.

-6-

Hopkins knew that he needed to complete the forms before he could be approved for FMLA leave.  SOF ¶¶ 199-200.  Mr. Hopkins asserts that he was entitled to 15 days within which to return his medical provider certification under federal regulations.  Pl.'s SOF ¶ 5; *see* 29 C.F.R. § 825.305(b).

Ms. Campbell and Mr. Hopkins had another conversation on March 16, 2010, and Ms. Campbell asked Mr. Hopkins if he had located any billable work.  He explained that he had made efforts and was hopeful something would come through, but nothing had materialized as of yet.  Ms. Campbell informed Mr. Hopkins that HR had attempted to locate work for him but was not successful.  She then told him that he was terminated for lack of work, that he was eligible for rehire, that he would receive four weeks of severance pay, leave time, and that he would receive benefits through the end of the month.  His termination was effective as of March 16, 2010.  As a result, Mr. Hopkins did not receive two-weeks' notice in March that he would be terminated in the future, although he did receive four-weeks' severance pay and health insurance through the end of March 2010.

As a remedy, Mr. Hopkins demands damages based upon lost wages and benefits.

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law."  FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests.  *Anderson*, 477

U.S. at 248 (1986).  "[S]ummary judgment will not lie if the dispute about a material fact is

'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Id*.

Moreover, summary judgment is properly granted against a party that "after

adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial."  *Celotex*, 477 U.S. at 322.

### III. ANALYSIS

Mr. Hopkins claims that his rights have been violated, as guaranteed by federal

law under the FMLA, 29 U.S.C. § 2601, and its local counterpart, the District of Columbia

Family Medical Leave Act ("DCFMLA"), D.C. Code §32-501, *et seq*.

First, Mr. Hopkins alleges that his termination on March 16, 2010 was in direct

retaliation for his March 11 request for leave under the FMLA.  Am. Compl., Count One.

Second, he alleges that his termination was "discriminatory" because it interfered with his FMLA

rights.  *Id*., Count Two.  Third, he alleges that his termination interfered with his rights under the

FMLA "because he was entitled to request leave without interference from the company."  *Id.*,

Count Three.  Finally, he asserts the same violations under the DCFMLA.  *Id.*, Counts Four, Five

and Six.

### A.  Mr. Hopkins' Claims under the FMLA

Federal law provides that an "eligible employee"[5] may be entitled to twelve weeks

---

[5]  Having worked at least 1250 hours within the 12 months preceding his termination, Mr.
Hopkins was an "eligible employee" entitled to FMLA leave if he had a "serious medical
condition" as defined by the law and precedent.  *See* 29 U.S.C. § 2611(2); *Id*. at § 2612(a)(1)(D).

of unpaid leave during any twelve-month period if a "serious health condition" prevents him

from performing his job functions.  29 U.S.C. § 2612(a)(1)(D).  Mr. Hopkins has two relevant

claims under the FMLA:

> The FMLA creates two types of claims: interference claims, in which
> an employee asserts that his employer denied or otherwise interfered
> with his substantive rights under the Act, *see* 29 U.S.C. § 2615(a)(1),
> and retaliation claims, in which an employee asserts that his employer
> discriminated against him because he engaged in activity protected by
> the Act, *see* 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c) .
> . . .[6]

*Strickland v. Waterworks and Sewer Bd. of the City of Birmingham*, 239 F.3d 1199, 1206 (11th

Cir. 2001); *see also Roseboro v. Billington*, 606 F.Supp.2d 104, 107 (D.D.C. 2009) (discussing

retaliation claims as those only under § 2615(a)(2)).

Prohibited retaliatory conduct under the FMLA includes: 1) under 29 U.S.C. §

2615(a)(1) "the Act's prohibition against 'interference' prohibits an employer from

discriminating or retaliating against an employee or prospective employee for having exercised or

---

Mr. Hopkins presents evidence that he was diagnosed with depression, stress, and anxiety prior
to March 11, 2010.  Grant Thornton challenges the sufficiency of this evidence and notes that, in
any event, it was never submitted to the company.  Mr. Hopkins concedes that his medical
certification was never submitted to Grant Thornton.  Instead, his argument rests on the fact that
he was discharged before the end of a 15-day period in which to submit such documentation,
which, he argues, both interfered with his FMLA rights and discriminated/retaliated against him
because he requested FMLA leave.  The question of whether Mr. Hopkins actually suffered from
a serious medical condition will not be resolved by the Court and it will assume that, put to the
proof, Mr. Hopkins could satisfy this fundamental requirement of the statute.  As a result, this
particular fact dispute, although material in other cases, is not material here and need not
preclude summary judgment.

   [6]  While the text of the FMLA does not clearly label these two claims as ones for
"retaliation" and for "interference," "those are the labels courts have used in describing an
employee's conduct under the Act." *Strickland*, 239 F.3d at n.9.  As such, the term retaliation
will be used in this opinion to describe prohibited discriminatory or retaliatory conduct under the
Act, whether it is under § 2615(a)(1) or § 2615(a)(2).

attempted to exercise FMLA rights," *see* 29 C.F.R. § 825.220(c); and 2) under 29 U.S.C. §

2615(a)(2) an employer is prohibited from "discharg[ing] or in any other manner discriminat[ing]

against any individual for opposing any practice made unlawful by [the FMLA]" meaning that

"[i]ndividuals ... are protected from retaliation for opposing (e.g., filing a complaint about) any

practice which is unlawful under the [FMLA]," 29 C.F.R. § 825.220(e).  *See also Strickland*, 239

F.3d at 1206 (explaining employee's retaliation claim under 29 U.S.C. § 2615(a)(1)); *Deloatch v.*

*Harris Teeter, Inc.,* 797 F. Supp. 2d 48, 67 (D.D.C. 2011) (explaining individual's retaliation

claim under 29 U.S.C. § 2615(a)(2)).

## 1. "Discrimination" Claim – Count II

Mr. Hopkins advances both a "discrimination" and a "retaliation" claim, based on

the same fact pattern.  *See* Am., Compl. Count 1, ¶ 32 ("Plaintiff suffered an adverse

employment action, namely Plaintiff was terminated because he requested FMLA leave"); *Id*. at

Count 2, ¶ 39 ("Plaintiff requested FMLA leave and by virtue of terminating Plaintiff,

Defendants did substantially and willfully discriminate against Plaintiff by interfering with

Plaintiff's FMLA rights.").  Mr Hopkins notes that the terms discrimination and retaliation are

used interchangeably in local case law under the DCFMLA.  *See Washington Convention Ctr.*

*Auth. v. Johnson*, 953 A.2d 1064, 1075-76 (D.C. 2008); *Hamilton v. Howard Univ.*, 960 A.2d

308, 317 (D.C. 2008).  He argues that since Grant Thornton chose to file an Answer and did not

move to dismiss either his retaliation or discrimination claims, he can proceed here on both.  Not

so.  There is no allegation that Mr. Hopkins opposed any practice made unlawful under the

FMLA and was retaliated against on those grounds.  Mr. Hopkins' claim in Count 2 for

"discrimination" is essentially the same claim he makes in Count 1 for "retaliation" for

attempting to exercise his FMLA rights.  Consequently, Count 2 of the Amended Complaint will be dismissed.

### 2. "Retaliation" Claim - Count I

Mr. Hopkins alleges that the termination of his employment violated the FMLA because he was terminated in retaliation for his request for FMLA leave.  Claims of retaliation under the FMLA are analyzed under the burden-shifting framework adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Roseboro*, 606 F. Supp. 2d at 109. Under that burden-shifting framework,

> an employee may establish a prima facie case creating a presumption of retaliation by showing (1) that he exercised rights afforded by the [FMLA], (2) that he suffered an adverse employment action, and (3) that there was a causal connection between the exercise of his rights and the adverse employment action.

*Id*. (citation omitted).  "If a prima facie case is established, the burden then shifts to the defendant to overcome this presumption by proffering a legitimate basis for this adverse action, and then the burden shifts back to a plaintiff to show that the proffered reason is pretextual." *Dorsey v. Jacobson Holman, PLLC*, 756 F. Supp. 2d 30, 37 (D.D.C. 2010) (citing *Roseboro*, 606 F. Supp. 2d. at 109).

In order to find that Mr. Hopkins has made a prima facie case, the Court will assume that Mr. Hopkins requested FMLA leave in his discussion with Ms. Cambell and, thus, engaged in protected activity on March 11, 2010 under the Act.  *See Skrjanc v. Great Lake Power Service Co*, 272 F.3d 309, 314 (6th Cir. 2001) (finding notification to an employer of the intent to or a request for leave to be protected activity).  Mr. Hopkins certainly experienced an

-11-

adverse employment action when he was terminated on March 16, 2010.  The short period of

time between his protected activity and his termination lend support to the argument that the

former was the basis for the latter.  *See Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273

(2001) (causal connection may be established when time "very close").  It is also noteworthy that

Ms. Campbell, with whom he had the discussion about FMLA leave, is also the individual who

delivered the termination message.  Under this set of facts, Mr. Hopkins establishes a prima facie

case of retaliation.

Even so, Grant Thornton presents a legitimate, non-retaliatory reason for its

decision to discharge Mr. Thornton on March 16, 2010: 1) he had been insufficiently billable for

months; 2) he had no real prospects of future billable work, especially given his failure on the

WHS Project; and 3) DoD shut down the Iraq Stability Project on which he – and many others –

had been working so that he – and many others – were terminated.

Mr. Hopkins challenges the immediacy of his discharge without two weeks' prior

notice.  However, he had been repeatedly advised that he needed to find new work to retain his

position and, most particularly, had been told of his impending discharge in January 2010, if he

did not find new work.  At that time, Mr. Hopkins succeeded in joining the WHS Project, but his

success was short-lived and the Project managers let him go within three weeks.  Undoubtedly

this was a kind of "perfect storm" for Mr. Hopkins personally: he lost the security of work on the

Iraq Stability Project, he lost a colleague, and he lost an important personal relationship at

approximately the same time.  The reasons for his distress and anxiety may be obvious.  So too,

however, are the advance notices he received officially and in counseling that his job was at risk.

There is no evidence that the lack of an additional two-week notice before termination in March

2010 was tied to retaliation for having sought unpaid leave under the FMLA.  Mr. Hopkins does

not respond to this defense in his cross motion for summary judgment, but challenges it as

pretextual in opposing Grant Thornton's motion for summary judgment.

        Before analyzing the alleged pretext, the Court notes that Mr. Hopkins has

admitted that the reason for his discharge was "company cuts."  Pl.'s Mot. for Summ J., Ex. M

[Dkt. # 33-1] at 165 (Deposition of Erin  Baker).  Mr. Hopkins saw a physician's assistant, Erin

Baker, in late winter 2010 concerning his anxiety.  Ms. Baker saw Mr. Hopkins sometime before

February 23 and on February 23, March 10, and March 29 in that year.  More critically, when

questioned by Mr. Hopkins' counsel during her deposition, Ms. Baker verified the accuracy of

her notes which unequivocally stated that Mr. Hopkins told her that he was terminated because of

reductions in force, not retaliation:

> Q.  You mentioned also when referring to Exhibit 6 that Mr.
> Hopkins told you something about company cuts?
> A.  Yes.
> Q.  Did he tell you if that was the reason the company gave him for
> firing him or if that was what he believed the reason for firing him
> was?
> A.  He believed the reason for firing him was company cuts.
> Q.  Was he informed by the company that he was fired for
> company cuts?
> A. That I don't know.
> Q.  So he actually told you "I believe I was fired for company
> cuts"?
> A.  Yes.

Pl.'s Ex. M, at 165-66.  Counsel's argument concerning pretext is significantly undercut by this

contemporaneous statement by Mr. Hopkins attributing his discharge to reductions in force,

which is exactly the reason given by Grant Thornton.

        In considering Mr. Hopkins' contention that Grant Thornton has no legitimate

defense to his retaliation claim, the Court notes that the test is "whether [he] produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally [retaliated] against the plaintiff on a prohibited basis." *Cooke v. Rosenker*, 601 F. Supp. 2d 64, 73 (D.D.C. 2009) (quoting *Adeyemi v. Dist. of Columbia*, 424 F.3d 1222, 1226 (D.C. Cir. 2008)).

First, Mr. Hopkins cites the short time period between his conversation with Ms. Campbell concerning FMLA leave on March 11, 2010, and his official discharge on March 16, 2010. This timing is not determinative in light of the pre-existing decline in work under the Iraq Stability Project and the formal and informal warnings of job loss that Mr. Hopkins received before March 16, 2010.

Next, Mr. Hopkins states that because the Defendant has provided three different reasons for his termination, "a lack of billable work, poor performance, and a departmental shutdown" his termination is suspicious. Pl.'s Mem. in Opp'n to Def.'s Mot. For Summ. J. [Dkt. # 36] at 14. However, they are, in fact, one and the same: without work, Grant Thornton does not employ consultants. Mr. Hopkins did not have work, had not had sufficient work in months, and had no prospect for obtaining work within the company.

Mr. Hopkins also alleges disparate treatment because he was not provided with notice prior to his termination, whereas other employees were. If this allegation is true, it does not particularly point to any discriminatory motive in light of the fact that the Iraq Stability Project was ending the same month that Mr. Hopkins was terminated from employment. Mr. Hopkins also cites to various e-mails, which he claims show that there were unusual circumstances regarding his firing. However, these e-mails do not cast any question upon the

reason for Mr. Hopkins' termination.  Finally, Mr. Hopkins alleges that Grant Thornton was hiring at the time of his termination.  This again is of no consequence; a company may be experiencing issues and need to make cuts in one area of its business while needing to fill positions for another area or searching for employees with a different skill set.

Mr. Hopkins' pretext claim has no merit.  He admitted that "company cuts" caused his termination.  In addition, the record evidence is clear that (1) Grant Thornton lost work under the Iraq Stability Project contract over the period from August 2009 to March 2010; (2) over the same months, Mr. Hopkins was unable to find consultant work within Grant Thornton to keep himself adequately billable; (3) Mr. Hopkins was warned officially and informally since at least January 2010 that his job was in jeopardy without new work; and (4) the termination of the contract for the Iraq Stability Project caused a reduction in force that resulted in the termination of 50 or more consultants and at least one partner at Grant Thornton, not just Mr. Hopkins.

The Court will grant summary judgment in favor of Grant Thornton on Count 1, retaliatory discharge for exercising FMLA rights.

## 2. Interference Claim – Count III

Relying on the FMLA regulation at 29 C.F.R. § 825.305(b),[7] Mr. Hopkins argues

---

[7] This regulation provides that: "In most cases, the employer should request that an employee furnish certification at the time the employee gives notice of the need for leave or within five business days thereafter, or, in the case of unforeseen leave, within five business days after the leave commences. The employer may request certification at some later date if the employer later has reason to question the appropriateness of the leave or its duration. The employee *must provide the requested certification to the employer within 15 calendar days after the employer's request*, unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts or the employer provides more than 15

that Grant Thornton was required to give him 15 days to present medical documentation after his request for FMLA leave and that his discharge during that time interfered with his rights.  He cites multiple cases for the proposition that an adverse action during that short period may interfere with FMLA rights despite the lack of substantiated proof of a serious medical condition. The Court does not quibble with the principle, but it is inapplicable here.

Rights to FMLA leave – whether in the application phase, medical certification phase, or off-work phase – do not protect an employee's job against a legitimate, unrelated, reason for separation from employment.  Thus, employers' bankruptcies, goings-out-of-business, loss-of-contracts, and other events have just as much impact on the employee with FMLA rights as on his co-workers.  *See Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 961 (10th Cir. 2002) ("[A]n employee may be dismissed, preventing her from exercising her statutory right to FMLA leave — but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave.");  *Edgar v. JAC Products,* 443 F.3d 501, 508 (6th Cir. 2006) ("[I]nterference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct.");  *Sarnowski v. Air Brooke Limousine, Inc.,* 510 F.3d 398, 403 (3d Cir. 2007) ("[T]he FMLA does not provide employees with a right against termination for a reason other than interference with rights under the FMLA.");  *see, e.g. Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 977, 980 (8th Cir. 2005) ("The FMLA simply does not force an employer to retain an employee on FMLA leave when the employer would not have retained the

--------

calendar days to return the requested certification."  29 C.F.R. § 825.305(b) (emphasis added).

employee had the employee not been on FMLA leave . . . [An] example of an employer's lawful ability to interfere with an employee's FMLA leave rights might be when an employer goes out of business while an employee is on FMLA leave."); *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 547 (4th Cir. 2006) (same); *Grubb v. Southwest Airlines*, 296 Fed. Appx. 383, 391 (5th Cir. 2008) (same); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 636 (7th Cir. 2009) (same).

   The many courts that have considered this issue have reached this same conclusion through their reading of 29 C.F.R. § 825.216(a), which provides "[a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment."  29 C.F.R. § 825.216(a). Relying on this text, the Courts of Appeals for the Eight, Ninth, and Tenth Circuits have concluded that an employer has the burden of proving that an employee dismissed during FMLA leave would have been dismissed regardless of the employee's request for leave.  *Smith*, 298 F.3d at 963; *Sanders*, 657 F.3d at 780; *Throneberry*, 403 F.3d at 989.  In this circumstance, if the burden is on Grant Thornton to show that it had a legitimate reason, unrelated to the exercise of FMLA rights, to terminate Mr. Hopkins, it has met this burden.

   Mr. Hopkins was an at-will employee who could be discharged at any time and for any reason as long as the reason was not illegal. Grant Thornton responds with the same legitimate, nondiscriminatory reason for its discharge decision: Mr. Hopkins had no consulting work, had not had sufficient billable consulting work in months, and had no prospect of sufficient billable consulting work because the Iraq Stability Project was terminated.

Mr. Hopkins presents a simple syllogism: he "was given the medical certification on March 11, 2010 along with 15 days to complete it, yet he was terminated only five days later on March 16, 2010 . . . . Accordingly, Defendant interfered with [his] FMLA rights."  Pl.'s Mem. of P. & A. in Supp. of Mot. Summ. J. [Dkt. # 33] at 8-9.  While the logic of the syllogism appears sound, its conclusion fails in the face of Grant Thornton's legitimate, non-discriminatory reason for the discharge.

The Court will grant summary judgment in favor of Grant Thornton on Count Three, interference in violation of the FMLA.

### B.  DCFMLA Claims – Counts IV, V & VI

Mr. Hopkins was offered employment with Grant Thornton's GPS division "for the position of Senior Consultant based in [its] Alexandria, Virgina office."  He mostly worked for the GPS Division of Grant Thornton in Virgina and abroad in Iraq.  It is undisputed that while Mr. Hopkins was employed with Grant Thornton, he "did not spend more than 50% of his working time within the District of Columbia."  Def.'s SOF ¶ 163.  However, he did work on one project in the District, for six months from 2007 to 2008, and again for approximately six weeks in the fall of 2009.  For most of his employment, he was based in either in Iraq or in Virginia.  Based on his employment history, Mr. Hopkins is not an employee that is eligible for coverage under the DCFMLA.

The DCFMLA provides coverage to employees who work in the District. On November 19, 2010, the District of Columbia Office of Human Rights ("OHR") adopted a regulation stating that in order to be eligible for DCFMLA benefits, an individual must spend more than 50% of his work time working for an employer in the District.  4 D.C. Mun. Regs §

1603.5.  Prior to that, the then D.C. Department of Human Rights, in a Notice of Final

Rulemaking, stated that the Act applied to employees "in the District of Columbia."[8]  38 D.C.R.

4350 (July 12, 1991).

        While Mr. Hopkins certainly worked in the District of Columbia for periods of

time, he was not an employee in the District.  He was hired to work out of Grant Thornton's

Alexandria, Virginia office and spent less than 30% of his time in the District.  For the year

leading up to his termination, there is only a record of six weeks that he spent working in the

District.  This hardly qualifies him as an employee in the District of Columbia.

        Mr. Hopkins cites to a proposed D.C. regulation that would have provided

DCFMLA coverage for those employees working within 75 miles of the District.  However, this

regulation was rejected.  Pl.'s Mem. of P. & A. in Supp. of Mot. for Summ. J. [Dkt. # 33] at 4.

Mr. Hopkins cannot attempt to expand the coverage of this Act based on a regulation that never

took force.

        The DCFMLA simply does not apply to Mr. Hopkins.  For this reason, Counts

Four, Five and Six will be dismissed.

### IV. CONCLUSION

        Mr. Hopkins reads the law, the FMLA/DCFMLA regulations, and his own

situation in black and white, supporting his claims to interference and retaliation.  He ignores the

larger picture of commercial events within Grant Thornton whereby the loss of the contract for

---

[8]  Defendant's Counsel has provided a copy of these regulations in their Opposition to Plaintiff's Motion for Summary Judgment, Dkt. # 34-1.  The Court takes judicial notice of the copy of the regulations provided by counsel.

the Iraq Stability Project led to large reductions in force, including the involuntary departure of a

Grant Thornton partner.  The FMLA rights he claims cannot withstand the force of the larger

events.

For the reasons stated, Defendant's Motion for Summary Judgment, Dkt # 32,

will be granted and Plaintiff's Motion for Summary Judgment, Dkt. # 33, will be denied.  Grant

Thornton International will also be dismissed.  A memorializing Order accompanies this

Memorandum Opinion.

Date: March 31, 2012                         _____/s/_____
                                             ROSEMARY M. COLLYER
                                             United States District Court